AO 106 (Rev. 04/10) Application for a Search Warrant

# United States District Court

### for the
### Western District of New York



FILED
MAY 10 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

1659 Amherst Street, Apt. #1, Buffalo, New York

Case No. 18-M- 62

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

1659 Amherst Street, Apt. #1, Buffalo, New York. The structure is a two story, wood framed, apartment building with blue siding and white trim.  The numbers "1659" are visible on a sign for "Fairfield Commons" in front of the property. Apartment #1 is contained within the larger structure. **See Exhibit A - Description of Premises to be Searched, attached hereto and incorporated as though set forth fully herein.**

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

**See Exhibit B - Schedule of Items to be Searched for and Seized,**
**attached hereto and incorporated as though set forth fully herein**

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of 21 U.S.C. §§ 846 and 841(a)(1).

The application is based on these facts:

- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DAVID L. LAUER
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  May 10, 2018  3:44 pm

_____
*Judge's signature*

City and state:   Buffalo, New York

HONORABLE H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

## EXHIBIT A

### DESCRIPTION OF PREMISES TO BE SEARCHED

The Subject Premises to be searched is located at 1659 Amherst Street, Apt. #1, Buffalo, New York. The structure is a two story, wood framed, apartment building with blue siding and white trim. The numbers "1659" are visible on a sign for "Fairfield Commons" in front of the property. Apartment #1 is contained within the larger structure. Photographs of the Subject Premises is below.





## EXHIBIT B

### SCHEDULE OF ITEMS TO BE SEARCHED FOR AND SEIZED

1.      All controlled substances and drug paraphernalia, including but not limited to cocaine and heroin, scales, measuring devices and weighing devices, diluting or cutting agents, grinders, packaging materials, including plastic, tin foil, cellophane, jars, utensils, plastic bags, and items used in processing, and selling cocaine and heroin;

2.      Records, items and documents, whether such documents are stored in documentary or electronic form, reflecting purchases of controlled substances and/or travel in furtherance of drug trafficking, including credit card receipts, correspondence, airline tickets, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

3.      Money ledgers, distribution or customer lists, supplier lists, correspondence, notations, logs, receipts, invoices, orders, journals, books, records and other documents noting the price, quantity, and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed, whether such records are stored in documentary or electronic form.

4.      Cash derived from the sale of cocaine and heroin or other controlled substances.

5.      Bank account records, wire transfer records, bank statements, money containers including safes, financial records, and notes showing payment, receipt,

concealment, transfer, or movement of money generated from the sale of cocaine and heroin, whether such bank records are stored in documentary or electronic form.

6.    Indicia of occupancy, residency or ownership of the Subject P remises including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, canceled envelopes and keys, whether such items are stored in documentary or electronic form.

7.    Personal telephone and address books and listings, photographs (digital and traditional), videotapes (digital and traditional), surveillance recordings, letters, telegrams, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in unlawful drug trafficking activities, whether such documents are stored in documentary or electronic form.

8.    Cellular telephones, personal computers, tablets, smart cellular telephones, paging devices, beepers, and other communication devices which may indicate evidence of possession with intent to distribute or distribution of controlled substances, including marijuana or participation in a conspiracy to manufacture or distribute controlled substances, including marijuana, including:

    a.    Any subscriber information, contact information to include, names, addresses, telephone numbers, email addresses or other identifiers;

    b.    Any call log information, including missed, incoming and outgoing calls and any information associated with those numbers;

    c.    Any photographs, video and audio files;

d.      Any text messages, email messages, chats, multimedia messages, installed applications or other electronic communications;

e.      Any calendar, note, password, dictionary entries;

f.      Any internet or browser entries or history;

g.      Any system, data or configuration information contained within the device.

9.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds of the sales of smuggled goods or synthetic controlled substances and/or synthetic controlled substance analogues, whether such records are stored in documentary or electronic form.

10.     Any lockbox, safe, or vault found on the premises.

11.     During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.

3

## AFFIDAVIT

STATE OF NEW YORK   )
COUNTY OF ERIE        )        SS:
CITY OF BUFFALO      )

**DAVID L. LAUER**, being duly sworn, deposes and states:

1.      I have been employed as a Special Agent for the Drug Enforcement Administration (DEA) since October 1998. Your Affiant received training in drug investigations and related legal matters at the DEA Training Academy in Quantico, Virginia. I am currently assigned to the Task Force Group, D-58, which is comprised of Special Agents and local law enforcement officers.

2.      I have participated in and conducted numerous investigations that have resulted in the arrests of individuals who have smuggled, received and distributed controlled substances, including marijuana, heroin and cocaine, as well as the seizure of illegal drugs and proceeds of the sale of those illegal drugs.

3.      The information within this Affidavit is based upon my personal knowledge and observations, as well as information supplied to me by other Special Agents of the DEA and law enforcement personnel. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation.

4.      This affidavit is made in support of a search warrant for the premise located at:

**1659 Amherst Street, Apartments, Apartment 1, Buffalo, New York** (the "Subject Premises," more fully described in Exhibit A, which is attached hereto and incorporated herein by reference).

## PROBABLE CAUSE

5.      On April 11, 2018, Task Force Officer (TFO) Nathan Shumaker of the DEA Buffalo Resident Office and your Affiant interviewed a Confidential Source, hereinafter referred to as CS-1[1] regarding the drug trafficking activities of **YARD**. CS-1 stated that CS-1 has known **YARD** to be a distributor of both heroin and cocaine for several years. CS-1 stated that CS-1 has personally purchased both cocaine and heroin from **YARD** on several occasions. CS-1 also noted that **YARD** utilizes cellular telephone 716-390-6808 to conduct his drug trafficking activities. I have confirmed through an administrative subpoena to Sprint that **YARD** is the subscriber for the Sprint service for this cellular telephone.

6.      Shortly after receiving this information, TFO Shumaker and your Affiant learned that **YARD** was utilizing a 2018 Chevrolet Impala bearing NY license HTV5233. A DMV query revealed that this vehicle was a rental car and further query revealed that YARD

---

[1] CS-1 was established as a DEA Confidential Source (CS) on April 18, 2018. CS-1's motive for providing information to the DEA is financial gain. Although just recently established as a CS, CS-1's information has been proven reliable by law enforcement personnel. CS-1 assisted in corroborating the intelligence provided regarding YARD, and CS-1 has been corroborated by a successful controlled purchase conducted with YARD. CS-1 has two prior arrests for DUI and has been arrested twice (2012 and 2016) for violating NY Penal Law 220 – Criminal Possession of a controlled substance.CS-1 received two years probation for the 2012 arrest and the 2016 arrest's disposition is pending.

was the renter for this vehicle. **YARD** listed an address of 1659 Amherst St., Buffalo, NY in the rental agreement.

7.     At my direction, CS-1 conducted a controlled purchase of a quantity of heroin from **YARD** in Buffalo, NY. CS-1 was searched for contraband prior to the controlled purchase and the search yielded negative results. CS-1 exchanged a series of text messages with YARD to arrange the controlled purchase. During these text message exchanges, **YARD** asked CS-1 if CS-1 wanted to purchase "soft".  Based on your affiant's experience and training, I am aware that the term "soft" is frequently used to describe cocaine hydrochloride. Subsequent text messages were exchanges to establish that the purchase would be for heroin. **YARD** arrived to the location of the controlled purchase in the rental car bearing NY License HTV5233 and provided CS-1 with a quantity of suspected heroin, for which CS-1 provided payment with government funds. The controlled purchase was audio and video recorded. DEA has implemented new policy that prohibits all SAs and TFOs from field testing any drugs due to the fentanyl dangers. Although the analysis for this purchase has not been completed by the DEA Laboratory, based on my training and experience, the suspected heroin purchased from **YARD** was packaged similarly to other heroin controlled purchases that I have personally conducted.

8.     On May 07, 2018, New York State Police (NYSP) Trooper Dan Snyder, while conducting routine patrol, observed a 2018 Chevrolet Impala bearing NY License HTV5233 traveling westbound on Interstate 90 in the Town of Glen. This vehicle was stopped for vehicle and traffic violations and was operated by **RAY** with **YARD** as the only passenger. During the traffic stop, NYSP Trooper Snyder, a K9 handler, noticed the odor of marijuana

coming from the vehicle and subsequently conducted an exterior search of the vehicle with his NYSP K9. The NYSP K9 alerted to the presence of a controlled substance emanating from the vehicle. **RAY** and **YARD** each confirmed that the contents of the vehicle belonged to them. A subsequent search of the vehicle led to the discovery of two kilogram-sized bricks containing a white powder substance in the trunk area of this vehicle. **RAY** and **YARD** were immediately arrested and subsequently lodged in the Montgomery County Jail. **RAY** and **YARD** had three cellular telephones in the vehicle at the time of their arrest, one being the cellular telephone 716-390-6808, which YARD utilized during the controlled purchase with CS-1 as described above. A field test of the substances seized from the vehicle, performed by the NYSP, indicated the presence of cocaine.

9.     On May 07, 2018, your Affiant again issued an administrative subpoena to Sprint for any/all cellular telephone records associated with YARD's cellular telephone 716-390-6808. As a result of the records provided by Sprint, your Affiant was able to examine the NEID codes associated with all the calls made to/from this cellular telephone during the previous thirty days. These NEID codes reflect the network element that handled each telephone call made/received. After examining these NEID codes, your Affiant discovered that YARD's cellular telephone made an outgoing telephone call on May 06, 2018, at approximately 1:11 a.m., in the Buffalo, NY network. On May 06, 2018, at approximately 11:10 a.m., YARD's cellular telephone made an outgoing telephone call in the Albany, NY network. On May 06, 2018, at approximately 7:10 p.m., YARD's cellular telephone made an outgoing telephone call in the Long Island, NY network. Your Affiant is aware that the greater New York City, NY area represents a source city for cocaine. In addition, your Affiant has conducted numerous investigations in which individuals traveled to the greater New York

4

City, NY area to secure shipments of cocaine and/or heroin. Based on the aforementioned NEID codes, your Affiant believes that **YARD** and **RAY** departed Buffalo, NY on May 6, 2018, and traveled to the greater New York City, NY area, where **YARD** and **RAY** secured two kilograms of cocaine for subsequent distribution in Buffalo, NY. Your affiant believes that if **YARD** and **RAY** were not stopped by NYSP on May 7, 2018 during their return trip to Buffalo, NY, the two kilograms seized would have been distributed in the Buffalo, NY area.

10.    On May 10, 2018, TFO Shumaker issued an administrative subpoena to Fairfield Commons Apartments located at 1659 Amherst Street, Buffalo, NY, and discovered that **RAY** is the renter for apartment #1 at this apartment complex. According to the information received pursuant issuance of this administrative subpoena, **RAY** is the only individual listed on the contract for this rental and **RAY** has rented this apartment since September 14, 2014. In addition, following the arrest of **YARD** and **RAY** on May 07, 2018, by the NYSP, both **YARD** and **RAY** listed 1659 Amherst St., Apt #1, Buffalo, NY as their residence. As noted above, **YARD** listed 1659 Amherst St., Buffalo, NY as his address for a car rental contract with EAN Holdings. This contract between **YARD** and EAN Holdings was signed April 13, 2018.

11.    While your affiant has no specific information that heroin and/or cocaine is presently stored at the Subject Premises, based on my training and experience in conducting other investigations and my discussions with other experienced law enforcement officers participating in this investigation,  I have learned:

a)  Traffickers of controlled substances, including cocaine and heroin, frequently maintain at their residence, garage, place of business, and/or inside their vehicles, quantities of controlled substances and/or other illicit drugs to maintain their ongoing drug business.

b)  In addition to drugs, traffickers of controlled substances, including heroin and cocaine, usually keep at their residence, garage, place of business, and/or inside their vehicles, paraphernalia for the labeling, packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents and utensils.

c)  Traffickers of controlled substances, including heroin and cocaine, commonly maintain records, notes, and other papers relating to drug trafficking, some of which may be in code, including but not limited to sales receipts, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, records, operating manuals, computer records, publications, notes, checks, money orders, and money transfer receipts. The aforementioned records, notes, and other papers are commonly maintained where the smuggler or drug possessor/trafficker has ready access to them, such as on their person, or in their homes, garages, vehicles or businesses, or even in electronic storage devices, including, but not limited to computers, computer storage disks or drives, tablet devices, cellular telephones and other electronic devices.

d)  Traffickers of controlled substances, including heroin and cocaine, commonly maintain books or papers that reflect addresses or telephone numbers for their associates or sources of supply and such items may be in code. The above addresses and telephone numbers may also be stored in electronic storage mediums, including but not limited to cellular telephones, tablet devices, computers, computer storage disks or drives, and other electronic devices.

e)  Traffickers of controlled substances, including heroin and cocaine, commonly take, or cause to be taken, photographs/videos of themselves, their associates, their property, their drugs, or their proceeds, and usually maintain these photographs/videos in their residences. The above photographs/videos may also be stored in electronic storage media, including but not limited to, cellular telephones, digital cameras, tablet devices, home computers, computer storage disks or drives, and other electronic devices.

f)  Traffickers of controlled substances, including heroin and cocaine, commonly maintain pagers, cellular telephones and other communication devices on their person, in their residences, vehicles, and/or their businesses, that are utilized to further their drug trafficking activities.

6

g) Cellular telephones frequently have telephone directory features, as well as methods to learn the telephone number associated with other cell phones. Cellular telephones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names.

h) Cellular telephones typically have voice mail and/or text-messaging features, which permit the cellular telephone user to send and receive voice mail and/or text messages. Voice mail and text messages are typically stored on the computer network of the provider of the cell phone's telephone service, which network is external to the cell phone. Sent and received text messages may also be stored on the cell phone itself.

i) Cellular telephones with camera functions permit the cell phone user to take photographs and/or videos that are stored on the cell phone itself.

j) The information described in subparagraphs (g), (h) and (i) above, usually remains accessible in the cell phone's memory card even if the cell phone has lost all battery power, and not been used for an extended period of time.

k) Certain electronic devices, including i-Phones, Blackberries, i-Pods, and Android phones, store information such as email messages, chats, multimedia messages, installed applications or other electronic communications, calendars, notes, passwords, dictionary entries, Global Positioning Satellite (GPS) entries, internet protocol connections, and location entries, including cell tower and WiFi entries, and internet or browser entries or history. In addition, these devices often contain proprietary software, in the form of system, data, or configuration information, which enable the types of information and data described above to be accessed and analyzed. These items remained stored on the electronic devices even if the device in question has lost all battery power, and has not been used for an extended period of time.

l) Traffickers of controlled substances, including heroin and cocaine, commonly keep and utilize personal computers to further their drug trafficking activities. The use of personal computers by drug traffickers, as well as by the general public, has increased dramatically during the past several years. I have participated in investigations where computers, internet-enabled cellular "smartphones," and conventional cellular telephones were seized and searched pursuant to court authorized search warrants that contained digital photographs of bulk cash and pictures of the target with smuggling and drug associates, as well as text messages referencing smuggling and drug transactions.

m)    Traffickers of controlled substances, including heroin and cocaine, often use e-mail, social networking websites, and the internet to further their criminal activity, by, among other things, communicating with their coconspirators, meaning others who are involved with and/or or provide assistance with the illegal purchase, possession or manufacture or distribution of controlled substances, and posting information about their exploits.

n)    Traffickers of controlled substances, including heroin and cocaine, commonly hide contraband; proceeds of drug sales, including currency, financial instruments, precious metals, jewelry, and other items of value; and records of drug transactions, drug sources, and drug customers in secure locations within their residences, garages, vehicles, safe deposit boxes, businesses and storage areas for ready access and to conceal such items from law enforcement authorities.

o)    Traffickers of controlled substances, including heroin and cocaine, must maintain, on hand, United States currency in order to maintain and finance their ongoing drug business and the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

p)    When traffickers of controlled substances, including heroin and cocaine, amass large proceeds from the sale of drugs, they attempt to legitimize these profits by utilizing banks, and their attendant services: securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, and business fronts, among other things. Additionally, traffickers are known to "co-mingle" legitimate business sales with illicit sales in an attempt to launder drug proceeds and foil efforts by law enforcement to detect and seize illicit proceeds.

q)    Traffickers of controlled substances, including heroin and cocaine, often place assets in names other than their own to avoid detection of those assets by government agencies while continuing to use those assets and exercise dominion and control over them.

r)    Traffickers of controlled substances, including heroin and cocaine, often seem to live above their means and I am aware that courts have recognized that unexplained wealth is probative evidence of crimes motivated, at least in part, by greed, and in particular, trafficking in smuggled goods or controlled substances.

12.    It is my understanding that the Court of Appeals for the Second Circuit has approved the use of "books and records" warrants in cases where major drug traffickers are

under investigation.   In my opinion and experience, and based upon the substantial quantity of cocaine that was seized on May 07, 2018 by the NYSP from **YARD** and **RAY**, the individuals whose residence we seek authorization to search are major drug traffickers.  In an application similar to this one, the Second Circuit stated, in <u>United States v. Fama</u>, 758 F.2d 834, 838 (2d Cir. 1985), as follows:

> While probable cause to arrest does not necessarily give rise to probable cause to search [the Affiant] had stated in the affidavit that his ten year experience as a DEA agent had taught him that major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers, and other documents evidencing their criminal activities.  A number of cases have ruled that an Agent's expert opinion is an important factor to be considered by the Judge reviewing a warrant application.  <u>e.g.</u>, <u>United States v. Young</u>, 745 F. 2d 733, 758 (2d Cir. 1984); <u>United States v. Foster</u>, 745 F.2d 871, 878 (9th Cir. 1983), cert. denied, ___U.S.___, 104 S.Ct. 1602, 80 L. Ed. 2d 132 (1984); <u>see also</u>, <u>Texas v. Brown</u>, 460 U.S.1535, 1545, 75 L. Ed. 2d 502 (1983) (Powell, concurring in the judgment).  Thus, it should also be considered as a factor contributing to objective good faith.

Based upon the foregoing, it is respectfully submitted that there is probable cause to believe that the Subject Premises contains fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 846 and 841(a)(1).  I am respectfully requesting that this application and accompanying documents be sealed based upon the risk to future and ongoing investigations as a result of the release of this information.

### No-Knock Permission Sought

13.   Your affiant is aware that Title 18, U.S.C. Section 3109 requires law enforcement officers to "knock and announce" their purpose prior to entering pursuant to authority of a search warrant. This application and affidavit seeks permission to enter without complying with this statute for the following above-listed residence: **1659 Amherst Street,**

**Apt. #1, Buffalo, New York.** This Court can, upon application, grant such permission upon a review of reasons for a "no-knock" entry. In the instant case, your affiant/applicant has reasonable suspicion to believe that knocking and announcing will be dangerous or futile.

14.     Because of the circumstances present in this investigation that may, possibly, create a danger to the executing Officers and Agents, as well as the possibility of destruction of evidence, specifically quantities of cocaine, heroin and other narcotics which based on your affiant's experience can be easily destroyed in a short time or records of narcotics trafficking which can easily be shredded, your affiant is also applying for permission to enter without knocking. This investigation has revealed that targets are sellers of cocaine and heroin. Based on your affiant's knowledge and experience with narcotics trafficking there is a direct correlation between the distribution of narcotics and the propensity for violence and weapons possession.

15.     Further, it is the opinion of your affiant, that to knock and announce may create danger to the law enforcement personnel if the occupants are alerted in any way by the prior announcement of law enforcement.

16.     Further, based upon my training and experience it is common for drug sellers to possess weapons.   Any prior announcement, if weapons are present, may create a dangerous situation for law enforcement officers.

17.     Your affiant reasonably believes that a covert/unannounced entry or a "no-knock" entry will operate to ensure that the occupants do not have time to destroy evidence,

10

and that the potential for danger created by the possible presence of weapons will be minimized.

18.     Your affiant is advised by the United States Attorney's Office, Western District of New York, that in Richards v. Wisconsin, 520 U.S. 385 (1997), the U.S. Supreme Court commented that although exigent circumstances may exist in most felony drug cases, the Fourth Amendment does not permit a blanket exception to the knock-and-announce requirement for felony drug investigations. The Supreme Court noted that a no-knock entry may be authorized ahead of time by a court if facts and circumstances of the particular entry justify dispensing with the knock-and-announce requirement.

19.     And that "in order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standard (as opposed to a probable cause requirement) strikes the appropriate balance between legitimate law enforcement concerns at issue and the execution of search warrants and the individual privacy interests affected by no-knock entries." Richards v. Wisconsin, 520 U.S. 385, 394-95 (1997).

20.     Your affiant respectfully requests that this Court examine the reasons set forth above and grant permission to effectuate these Search Warrants without compliance with the "knock-and-announce" requirement with the above-referenced residences.

**WHEREFORE**, based on the aforementioned facts and circumstances, your Affiant respectfully submits that probable cause exists to believe that the crimes specified in this affidavit have been committed and that there is presently concealed in the premises listed above, quantities of illegal drugs, specifically cocaine and heroin, cash, books, receipts, ledgers, other documentation and records, cellphones, and other items described in this affidavit, and all of which, and more, are set forth in the Schedule of Items to be Seized (Exhibit B, which is attached hereto and incorporated by reference as though set forth fully herein), which are all of which are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to possess and to distribute a controlled substance); and Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance).  A search of the above described locations will yield the items of evidence and instrumentalities related to those crimes.

_____
DAVID L. LAUER
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me

this _16th_ day of May, 2018.

_____
HONORABLE H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

12

## EXHIBIT A

### DESCRIPTION OF PREMISES TO BE SEARCHED

The Subject Premises to be searched is located at 1659 Amherst Street, Apt. #1, Buffalo, New York. The structure is a two story, wood framed, apartment building with blue siding and white trim.  The numbers "1659" are visible on a sign for "Fairfield Commons" in front of the property. Apartment #1 is contained within the larger structure.  Photographs of the Subject Premises is below.





## EXHIBIT B

## SCHEDULE OF ITEMS TO BE SEARCHED FOR AND SEIZED

1.     All controlled substances and drug paraphernalia, including but not limited to cocaine and heroin, scales, measuring devices and weighing devices, diluting or cutting agents, grinders, packaging materials, including plastic, tin foil, cellophane, jars, utensils, plastic bags, and items used in processing, and selling cocaine and heroin;

2.     Records, items and documents, whether such documents are stored in documentary or electronic form, reflecting purchases of controlled substances and/or travel in furtherance of drug trafficking, including credit card receipts, correspondence, airline tickets, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

3.     Money ledgers, distribution or customer lists, supplier lists, correspondence, notations, logs, receipts, invoices, orders, journals, books, records and other documents noting the price, quantity, and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed, whether such records are stored in documentary or electronic form.

4.     Cash derived from the sale of cocaine and heroin or other controlled substances.

5.     Bank account records, wire transfer records, bank statements, money containers including safes, financial records, and notes showing payment, receipt,

concealment, transfer, or movement of money generated from the sale of cocaine and heroin, whether such bank records are stored in documentary or electronic form.

6.      Indicia of occupancy, residency or ownership of the Subject Premises including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, canceled envelopes and keys, whether such items are stored in documentary or electronic form.

7.      Personal telephone and address books and listings, photographs (digital and traditional), videotapes (digital and traditional), surveillance recordings, letters, telegrams, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in unlawful drug trafficking activities, whether such documents are stored in documentary or electronic form.

8.      Cellular telephones, personal computers, tablets, smart cellular telephones, paging devices, beepers, and other communication devices which may indicate evidence of possession with intent to distribute or distribution of controlled substances, including marijuana or participation in a conspiracy to manufacture or distribute controlled substances, including marijuana, including:

   a.    Any subscriber information, contact information to include, names, addresses, telephone numbers, email addresses or other identifiers;

   b.    Any call log information, including missed, incoming and outgoing calls and any information associated with those numbers;

   c.    Any photographs, video and audio files;

2

d.   Any text messages, email messages, chats, multimedia messages, installed applications or other electronic communications;

e.   Any calendar, note, password, dictionary entries;

f.   Any internet or browser entries or history;

g.   Any system, data or configuration information contained within the device.

9.   Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds of the sales of smuggled goods or synthetic controlled substances and/or synthetic controlled substance analogues, whether such records are stored in documentary or electronic form.

10.   Any lockbox, safe, or vault found on the premises.

11.   During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.